**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JAMISON ADSIT,

                         Petitioner,

        v.                                           No. 9:16-CV-00817
                                                    (GTS/CFH)
ANTHONY J. ANNUCCI, Acting Commissioner
of the Department of Corrections and Community
Supervision; TINA M. STANFORD, Chairwoman
of the New York State Board of Parole,

                         Respondents.

_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| The Abbatoy Law Firm, PLLC<br>45 Exchange Boulevard, Suite 925<br>Rochester, New York 14614<br>Attorney for Petitioner | DAVID M. ABBATOY, JR., ESQ. |
| Hon. Eric T. Schneiderman<br>Attorney General for the<br>State of New York<br>New York Office<br>120 Broadway<br>New York, New York 10271<br>Attorneys for Respondents | PAUL B. LYONS, ESQ.<br>Assistant Attorney General |

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

      Presently pending before the Court is a petition for a writ of habeas corpus filed

pursuant to 28 U.S.C. § 2254 by petitioner Jamison Adsit ("petitioner"), formerly an inmate

_____

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS").  Dkt. No. 1 ("Pet.") at 1.  On July 1, 2009, after a jury trial in Onondaga County Court, petitioner was convicted of criminal sexual act in the second degree.  Id.  Petitioner was sentenced to five years imprisonment, and is currently serving ten years of post-release supervision.  Id.  On July 6, 2016, petitioner filed a pro se petition seeking a writ of habeas corpus on the grounds that (1) his trial attorney was ineffective, and (2) he is actually innocent.  Id. at 5, 7.  On September 30, 2016, counsel David M. Abbatoy appeared on behalf of petitioner.  Dkt. No. 7.  On March 2, 2017, petitioner's counsel filed a memorandum of law in support of habeas corpus relief, arguing that petitioner's trial counsel was ineffective for asserting factually inconsistent and mutually exclusive defenses at trial.  Dkt. No. 16 ("Pet. Mem. of Law").  Respondents oppose the petition.  Dkt. No. 22 ("Resp. Mem. of Law").  For the reasons that follow, it is recommended that the petition be denied.

## I. Background

### A. The Trial

### 1. The Prosecution's Case

On the morning of October 1, 2008, paramedic Eric Bosco and his partner responded to a 911 call at a pharmacy in Syracuse, New York after receiving a report of a woman unconscious in the back of the store.  Dkt. No. 24-6 ("Tr. 2(1)") at 28.[2]  The

---

[2] The page numbers following Dkt. No. 24 refer to the pagination of the header numbers generated by CM/ECF, not the pagination provided in the transcripts.

woman, referred to hereafter as "B.N.," appeared to be unconscious; however, when the paramedics tried to rouse her, she would "move away." Id. B.N. did not speak, and Mr. Bosco noted that there was foam around her mouth. Id. Shortly after the paramedics loaded B.N. into the ambulance, she began to "seize" – "curl in on herself with her arms and then start[ ] to violently shake" – for about thirty seconds. Id. at 29.

The paramedics brought B.N. to the emergency room at Crouse Hospital in Syracuse, where Craig Hanifin, a physician's assistant, was stationed. Tr. 2(1) at 30, 34-35. Mr. Hanifan noted that B.N. was "awake and alert" and told him her name, but laid still and "had a gaze in her eyes where she wasn't focusing on much of anything." Id. at 36, 41, 42. Mr. Hanifin attempted to communicate with B.N., but she was unresponsive, aside from stating her first name, and repeating the phrase "right here" fifteen or twenty times. Id. at 37, 48. Although she could "follow only simple commands," B.N. was otherwise not "oriented" – i.e., she did not know the time or her location. Id. at 41, 42. Following Mr. Hanifan's examination, B.N. was sent for a CAT scan, and admitted to the neurology department. Id. at 37, 49. Mr. Hanifan admitted that although it was the hospital's standard policy that, absent emergency situations, a patient must consent prior to admission for treatment, he could not remember whether B.N. consented. Id. at 49-51.

Crouse Hospital employed a safety companion program which assigned individuals to sit with confused or disoriented patients. Tr. 2(1) at 54. On B.N.'s first night in the hospital, charge nurse Peggy Romero assigned petitioner to act as B.N.'s safety companion. Id. at 59. On October 2, 2008, Ms. Romero assigned nursing assistant Shontelle Williams to sit with B.N. during her 3:00 P.M. to 11:30 P.M. shift. Id. at 59, 60.

3

Ms. Williams identified that B.N. "could talk[,] but you didn't understand what she was saying because it had a lot to do with numbers and just a lot of rambling that you couldn't make sense of it." Id. at 61-62. B.N. watched television the majority of the time, but stood up and wandered off two times to go to the bathroom, but Ms. Williams had to "stop her and turn her so she would know that's the door to go to the bathroom." Id. at 67, 72. B.N. "would point to things, and [Ms. Williams] didn't know what she was talking about." Id. at 67. Ms. Williams noted that B.N. was not "physically helpless." Id. at 70. Approximately three or three-and-a-half hours into Ms. William's shift, petitioner entered the room and instructed Ms. Williams that the charge nurse assigned her to another patient, and that he would continue watching B.N. Id. at 60.

At approximately 10:50 P.M., Fred Cosby, another safety companion, arrived at the nurses' station to receive his room assignment for his overnight shift. Dkt. No. 24-8 ("Tr. 3") at 7. Mr. Cosby walked to his assigned room, and noticed that the door was closed, which was "kind of strange . . . [at the] change of shift time." Id. Upon entering the room, Mr. Cosby noticed that the curtain was pulled to separate the two patients in the room. Id. at 8. Mr. Cosby walked behind the curtain and saw petitioner "kneeling on the bed with one knee on the bed." Id. The woman in the bed was lying on her back, propped up on her elbows with pillows behind her. Id. at 9. Petitioner's "groin area" was positioned "[r]ight to where her face was." Id. Mr. Cosby turned and "bolted" toward the door. Id. Before Mr. Cosby could exit the room, petitioner approached him. Id. at 11, 12. Petitioner stated that he was "glad that [Mr. Cosby] walked in right then because this lady was crazy," and that B.N. had been "pulling on him" and "grabbing his groin" all night. Id. at 12. Petitioner told

4

Mr. Cosby "something to the effect that 'I'm so glad you got my back'" because they both worked for the same temporary staffing agency.  Id.  Mr. Cosby thereafter informed Ms. Williams what he had observed.  Tr. 2(1) at 62; Tr. 3 at 13.  Mr. Cosby and Ms. Williams then reported the incident to Ms. Romero, the charge nurse.   Tr. 2(1) at 62-63; Tr. 3 at 13.

Ms. Romero first learned of the incident when petitioner, along with B.N.'s bedside nurse Sara Enders, approached her at approximately 11:00 P.M. to file an incident report. Tr. 2(1) at 75-76.  Petitioner alleged that B.N. groped him.  Id.  Soon after, "it was brought to [Ms. Romero's] attention that something else had happened."  Id. at 76.  Petitioner remained at the nurses' station past the end of his 11:00 P.M. shift.  Id. at 77-78.  Ms. Romero described petitioner as "very nervous."  Id. at 78.

On the morning of October 3, 2008, Syracuse Police Officer John Tucker received a "sex offense call" from Crouse Hospital.  Dkt. No. 24-7 ("Tr. 2(2)") at 15-16.  Mr. Tucker first spoke with the nursing supervisor, then Mr. Cosby, and finally, B.N.  Id. at 16.  Tucker noted that B.N. "seemed very incoherent," and believed that her son was in the room, even though he was not.  Id. at 17.  Although she was speaking words, "there was nothing that really made any sense."  Id.  In the ten to fifteen minutes that Mr. Tucker spent in the room with B.N., B.N. pointed to things that were not in the room approximately one dozen times. Id. at 17-18.  Mr. Tucker was unable to gather any "meaningful information" from her.  Id. at 18.  However, Mr. Tucker acknowledged that B.N. did state her name, and informed him that she was not the missing woman reported in the newspaper.  Id. at 19, 20.

On October 3, 2008, Detective ("Det.") Brendan Finnerty of the Abused Persons Unit

interviewed petitioner at the police station. Tr. 2(2) at 32-33. Petitioner signed a <u>Miranda</u> waiver. <u>Id.</u> at 34. Petitioner told Det. Finnerty that, on the night of October 2, he acted as B.N.'s safety companion. <u>Id.</u> After he escorted her to the bathroom, she climbed back into bed, "grabbed him by the genitals and . . . put his penis in her mouth." <u>Id.</u> Det. Finnerty questioned petitioner's story, telling him that it was difficult to "understand how [B.N.] could do that if [petitioner] weren't erect or aroused." <u>Id.</u> at 34-35. Plaintiff acknowledged that he had been thinking about his girlfriend, and, therefore, had been "kind of erect and aroused." <u>Id.</u> at 35. Petitioner informed Det. Finnerty that B.N. said "she wanted it." <u>Id.</u> Petitioner declined to give a written statement, and was released pending further investigation. <u>Id.</u>

On the night of October 3, 2008, Det. Finnerty interviewed B.N. at the hospital. Tr. 2(2) at 35. Det. Finnerty described B.N. as "totally incoherent." <u>Id.</u> When asked if she knew where she lived, B.N. responded, "apples, triangles, and painting." <u>Id.</u> B.N.'s answers were not responsive to Det. Finnerty's questions. <u>Id.</u> at 36. B.N. remained in bed for the interview. <u>Id.</u>

Doctor Thomas Falci, a consulting psychiatrist at Crouse, first interviewed B.N. on October 3, 2008. Tr. 2(2) at 50, 53. Hospital representatives asked Dr. Falci to determine whether B.N. was able to consent to sexual activity and able to file a police report. <u>Id.</u> at 53. After reviewing her medical and lab reports, Dr. Falci determined that B.N. had a seizure prior to admission to the hospital, and had been confused after the seizure. <u>Id.</u> at 54. During their first meeting, Dr. Falci attempted to converse with B.N., but recognized that, "in basic layman's terms, the lights were on, but nobody was home." <u>Id.</u> at 55-56. Dr.

Falci described B.N. as "incoherent," and when he attempted to discuss with her what she was watching on the television, she "just started to ramble about Georgia." Id. at 56. Dr. Falci determined that B.N. was "globally confused" and "not able to interpret her environment." Id.

Dr. Falci described B.N. as being in a postictal state. Tr. 2(2) at 59. He stated that "there was a global dysfunction in the parts of [B.N.'s] brain that control[ ] speech, reception of speech, memory, working memory, executive function, decision making, . . . and . . . spacial recognition." Id. at 63. She understood some "very simple verbal commands." Id. at 66. Dr. Falci defined "aphasia" as "the difficulty in communicating with words." Id. at 67. B.N. had both "expressive aphasia" – where the patient has "difficulty [ ] expressing herself" – and "receptive aphasia" – in which the patient "cannot interpret what is told to [her]." Id. Dr. Falci recognized that B.N. had no memory of the prior night. Id. at 66. The information that B.N. relayed – her name, where she was born, and that she had a son – were "automatic responses" or "overlearned materials," and not affected by the seizure. Id. at 64-65. Similarly, B.N. could engage in "automatic routine behaviors" like going to the bathroom, but could not find the bathroom without assistance. Id. at 70. Dr Falci met with B.N. a second time on October 6, 2008, and noted that her condition had improved. Id. at 74.

In his assessment, Dr. Falci determined that B.N. could not have physically communicated an unwillingness to engage in a sexual act on the night of the incident. Tr. 2(2) at 75. Dr. Falci affirmed that, in his opinion, on October 2, 2008, B.N. was "suffering from a mental defect rendering her incapable of appraising the nature of sexual activity."

7

Id. at 76.

On October 3, 2008, nurses took oral and facial swabs from B.N. to collect DNA, and collected her bed linens, nightgown, and hand coverings for testing.  Tr. 2(2) at 141. Although forensic science expert Marie Guido found "one sperm" on the facial swab, there was not enough DNA to perform nuclear testing.   Tr. 3 at 20, 33.  However, Sheila Gentile, senior forensic scientist, testified that upon performing the more sensitive Y STR DNA testing, she "could not exclude Mr. Adist [ ] and his paternal relatives as contributors" of the DNA sample.  Id. at 33-34, 81.

## 2. Petitioner's Case

Petitioner did not testify at trial.  Dr. Richard Kavey, a board certified psychiatrist, considered B.N.'s medical records, police reports, witness statements, grand jury testimony, and other material associated with the case, and concluded that B.N. "suffered from a delirium that was getting rapidly better throughout the course of her hospitalization and that she wasn't physically helpless at the time of the alleged instance."  Tr.3 at 103-104, 106.  Further, in Dr. Kavey's opinion, B.N. "did have some ability . . . to understand her circumstances."  Id.   However, Dr. Kavey was unsure "to what degree she had ability to appraise a decision to enter into a sexual act – an act of oral sex" because the medical records were "not very clear and contradictory."   Id.   The medical records fail to demonstrate whether Dr. Falci or any other medical practitioner "specifically attempt[ed] to examine [B.N.] for capacity to engage in a sexual act and capacity to file a complaint, to understand – to ask her about sex."   Dkt. No. 24-9 ("Tr. 4") at 18.   In addition, Dr.

Karvey found that B.N.'s "expressive aphasia ma[d]e it difficult for her to reveal what she understands or for any examiner to get a good appreciation or appraisal . . . of what she is capable of thinking." Id.

### 3. Verdict and Sentencing

The jury found petitioner guilty of criminal sex act in the second degree, and not guilty of criminal sex act in the first degree. Dkt. No. 24-10 ("Tr. 5") at 16-17. On August 14, 2009, the Hon. Joseph E. Fahey sentenced petitioner to a determinate sentence of five years, followed by ten years of post-release supervision. Dkt. No. 24-11 ("Sentencing Tr.") at 7.

### B. Petitioner's Motion to Vacate the Judgment

On May 2, 2010, petitioner filed a pro se motion to vacate the judgment of conviction pursuant to N.Y. Crim. Law § 440.10. Dkt. No. 24-1 ("SR1") at 184 - Dkt. No. 24-2 ("SR2") at 285. First, petitioner argued that George Hildebrandt, Esq., the attorney who represented petitioner at the pre-trial Huntley hearing,  denied him effective assistance of counsel when he failed to hire: (1) an investigator, (2) a forensic expert to review physical evidence and interpret the findings of the prosecution's experts, and (3) a psychologist to interview the victim and interpret her medical records. Id. at 193. Moreover, petitioner argued that Mr. Hildebrandt improperly withdrew from representation. Id. at 199-201. Second, petitioner argued that Michael Spano, Esq., the attorney who represented him at trial, denied him effective assistance of counsel when he failed to: (1) call alleged

9

exculpatory witnesses, (2) cross-examine witnesses, (3) disclose a conflict of interest, and (4) hire expert witnesses to testify and explain the DNA evidence. Id. at 202-215, 227-240. Lastly, petitioner argued that the trial evidence was legally insufficient. Id. at 215-227.

On September 16, 2010, the Onondaga County Court denied petitioner's motion, determining that some of plaintiff's claims were procedurally barred because they could be raised in a direct appeal, and that petitioner "has not met [his] burden of demonstrating the absence of strategic or other legitimate explanations' [sic] for counsel's[3] alleged errors." Dkt. No. 24-3 ("SR3") at 61, 62. On June 24, 2011, the Fourth Department denied petitioner's application for leave to appeal. Id. at 80.

## C. Petitioner's Direct Appeal

Petitioner's attorney on direct appeal argued that: (1) the trial evidence was legally insufficient to support the conviction for criminal sexual act in the second degree; (2) the weight of credible evidence at trial did not support the conviction of criminal sexual act in the second degree; and (3) the trial counsel was ineffective because he asserted inconsistent defenses. SR1. at 1-34. The People opposed. Id. at 143-75.

In a decision dated February 6, 2015, the Appellate Division, Fourth Department, denied petitioner's appeal. SR1. at 176-77; People v. Adsit, 125 A.D.3d 1430 (N.Y. App. Div. 2015). The appellate panel concluded that the evidence at trial was "legally sufficient to establish that the victim lacked the mental capacity to appraise the nature of her sexual

---

[3] The September 16, 2010 decision addresses only Mr. Spano's representation. See SR3. at 60-63.

10

conduct and thus was unable to consent to defendant's actions." SR1. at 117. The panel concluded that the verdict was not against the weight of evidence. Id. The panel further "rejected defendant's contention that he was denied the right to effective assistance of counsel," concluding that "[v]iewing the evidence, the law and the circumstances of this case, in totality and as of the time of the representation . . . defendant received meaningful representation." Id.

Petitioner filed an application for leave to appeal to the New York State Court of Appeals. SR1. at 178-80. By Order dated May 7, 2015 the Court of Appeals denied petitioner's leave application. Id. at 183; People v. Adsit, 25 N.Y.3d 1068 (2015).

## II. Discussion

## A. Actual Innocence

As a preliminary matter, in his pro se petition, petitioner asserted an actual innocence claim, contending that:

> Eyewitness has three different accounts of what he "claimed" he saw; eyewitness's final account of what he stated made the accusation physically impossible to have happened; a fake confession was used against [petitioner] that was completely uncorroborated and disproven [sic] by forensic evidence showing detective committed perjury; [petitioner's] counsel refused to call witness that encountered detective's malicious intent toward [petitioner]; DNA evidence not belonging to [petitioner] was used against [petitioner] at trial; results of evidence collected and rape kit substantiate [petitioner's] claim of innocence; form of DNA testing used (Y-STR) tracks paternal lineage, which produces innumerable results, not isolated results.

Pet. at 7. Petitioner failed to raise this claim in his direct appeal as his appellate "counsel

11

stated that due to the fact an actual innocence claim was not contained in the trial record, it could not be raised."[4]  Id.  Instead, petitioner contends that he raised this claim in the additional answering affirmation of his CPL § 440.10 Motion to Vacate Judgment. Id.; SR2. at 204-205.  Petitioner's counseled memorandum of law does not address the actual innocence claim.  See Pet. Mem. of Law.

In Herrera v. Collins, the Supreme Court of the United States held that an actual innocence claim, "absent an independent constitutional violation occurring in the underlying state criminal proceeding," is not a ground for federal habeas relief.  Herrera v. Collins, 506 U.S. 390, 400, 404-05 (1993).  In McQuiggin v. Perkins, the Supreme Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass" to avoid the "expiration of the statute of limitations."  McQuiggin v. Perkins, 569 U.S. 383, 392 (2013).  The McQuiggin Court cautioned that its holding did "not resolve[ ] whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."  Id. at 392 (citation omitted).  Instead, the Court recognized that "a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief."  Id.

However, "the Second Circuit, citing [House v. Bell], recently suggested that a freestanding actual innocence claim may be valid if it meets the threshold standard set

_____

[4] To preserve "a question of law on appeal, a party must either make an objection at trial or the trial court makes an express ruling on a specific question." DeLee, 2013 WL 3049109, at *20 (citing N.Y. CRIM. PROC. LAW § 470.05(2); Garvey v. Duncan, 485 F.3d 709, 714 (2d Cir. 2007)).  "A petitioner is procedurally barred from seeking habeas relief on the basis of a claim not properly preserved in state court unless he provides an adequate justification excusing this error and demonstrates that prejudice has resulted from the alleged violation for which relief is being sought." Ballard v. Walker, 772 F. Supp. 1335, 1338 (E.D.N.Y. 1991) (citing Wainwright v. Sykes, 433 U.S. 72, 86-87(1977)).

forth in <u>McQuiggin</u>."  <u>Ortiz v. Semple</u>, No. 3:17-CV-167 (VLB), 2017 WL 2702245, at *5 (D.

Conn. June 22, 2017) (internal quotation marks omitted) (citing <u>Russo v. U.S.</u>, 692 F. App'x

75, 76 (2d Cir. 2017) (summary order) ("For the same reason, Russo has not stated a valid

freestanding innocence claim, as he has failed to satisfy even the most lenient actual

innocence standard, which requires a movant to demonstrate that, 'in light of new

evidence, it is more likely than not that no reasonable juror would have found [him] guilty

beyond a reasonable doubt.'")).  Generally, courts within this Circuit have declined to reach

freestanding actual innocence claims in light of uncertainty within the federal courts, or

have denied the claim based on the petitioner's inability to meet the "extraordinarily high"

standard.  <u>See</u> <u>Sweeney v. Laffin</u>, No. 12-CV-6483 (KMK) (LMS), 2017 WL 4342138, at

*7 (S.D.N.Y. Sept. 28, 2017) (internal quotation marks and citations omitted) ("Insofar as

Petitioner advances a freestanding actual innocence claim as a ground for habeas relief,

the Court notes that the Supreme Court has never expressly held that a petitioner may

qualify for habeas relief based solely on a showing of actual innocence.  However, even

if a freestanding actual innocence claim could warrant habeas relief, Petitioner has failed

to make such a showing because the threshold for any hypothetical freestanding innocence

claim [i]s 'extraordinarily high,' and such a showing requires more convincing proof of

innocence than the showing of innocence necessary to satisfy [Schlup v. Delo[5]]."); <u>Whitield</u>

<u>v. Graham</u>, No. 10-CV-3038 (RJS) (RLE), 2017 WL 4060571, at *3 (S.D.N.Y. Sept. 13,

2017) (citation omitted) (emphasis in original) ("[I]ndeed, the Supreme Court has *not*

---

[5] <u>Schlup v. Delo</u>, discussed further below, assesses the credibility of actual innocence claims.
<u>See</u> discussion II.A. at 14, <u>infra</u>.

definitively pronounced on whether actual innocence is a cognizable independent ground for habeas relief, while the Second Circuit has consistently *declined* to recognize freestanding actual-innocence claims."); Colon v. Sheahan, No. 13 Civ. 6744 (PAC) (JCF), 2016 WL 3919643, at *15 (S.D.N.Y. Jan. 13, 2016) (internal quotation marks and citations omitted) ("[T]he Supreme Court has not determined that such a claim can be the basis for issuance of the writ.  What is clear is that the burden to establish entitlement to the writ based on such a claim would be extraordinarily high — higher than the burden sufficient to overcome a procedural default. . . .  And because Mr. Colon cannot meet that standard, it is unnecessary to address the question the Supreme Court has refused to answer regarding whether federal habeas relief is ever available for a freestanding claim of actual innocence.").

Therefore, even if the undersigned concluded that petitioner's freestanding actual innocence claim is entitled to habeas relief, petitioner has failed to establish a credible claim of innocence.  A claim of actual innocence must be "credible and compelling."  Rivas v. Fischer, 687 F.3d 514, 541 (2d Cir. 2012).

> For the claim to be "credible," it must be supported by new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial.  For the claim to be "compelling," the petitioner must demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt — or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

Id. (citing Schlup v. Delo, 513 U.S. 298, 324 (1995); House v. Bell, 547 U.S. 518, 537-38 (2006)) (internal quotation omitted).  Petitioner has not set forth evidence of "new, reliable

evidence" not presented at trial, and the conclusory allegations set forth in his <u>pro se</u> petition do not establish that "no reasonable juror would find him guilty beyond a reasonable doubt." <u>Id.</u>

Accordingly, as petitioner has not properly placed his actual innocence claim before the Court under the statute of limitations scheme set forth in <u>McQuiggin</u>, and, because petitioner fails to meet even the most lenient standard for demonstrating that his actual innocence claim is credible and compelling, it is recommended that petitioner's claim be denied.

## B. Exhaustion

A petitioner in custody pursuant to a judgment of a state court is entitled to federal habeas relief only if he has exhausted all available state court remedies. <u>See</u> 28 U.S.C. § 2254(b)-(c). A claim has been exhausted if it was fairly presented in the state courts, thereby giving the state the "opportunity to pass upon and correct" alleged violations of federal rights. <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)). A petitioner need not have cited "book and verse on the federal Constitution" in his claim in state court for the claim to have been exhausted. <u>Picard</u>, 404 U.S. at 278 (quotation omitted). Rather, a petitioner may have fairly presented his claim to the state courts through

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegations of a pattern of facts that

15

is well within the mainstream of constitutional litigation.

Daye v. Attorney Gen. of the State of N.Y., 696 F.2d 186, 194 (2d Cir. 1982).

As the Second Circuit has held, "to invoke 'one complete round of the State's established appellate review process', a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." Smith v. Duncan, 411 F.3d 340, 345 (2d Cir. 2005) (quoting Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir. 2005)) (internal citation omitted). Applicants for leave to appeal must submit legal briefs and other documents to the New York State Court of Appeals, identifying the issues on which the application is based, and must focus on identifying problems of reviewability and preservation of error. See id.

In Smith v. Duncan, the Second Circuit stated that the New York State Court of Appeals would construe a petitioner's leave application as abandoning any claims that were presented to the Appellate Division, but not included in the leave application. See Smith, 411 F.3d at 345. In Grey v. Hoke, the Second Circuit held that where a petitioner requested review by the New York State Court of Appeals of only one of the three issues raised in the Appellate Division, the other two issues were not preserved for exhaustion purposes. See Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991). The Court found that it would "undermine the very considerations of comity" to consider a constitutional claim as to which no ruling was requested from the state appellate court. See id. (citation omitted).

If a petitioner has not exhausted his state court remedies, but no longer has

remedies available[6] in state court with regard to these claims, they are "deemed" exhausted, but are also procedurally defaulted.[7]  See Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) (citations omitted).  A state prisoner who has procedurally defaulted on a federal claim in a state court is entitled to federal habeas review of that claim only if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or that the federal court's failure to consider the claim will result in a miscarriage of justice.  See Coleman v. Thompson, 501 U.S. 722, 748-50 (1991).  A miscarriage of justice occurs if the constitutional violation has "probably resulted in the conviction of one who is actually innocent."  Murray v. Carrier, 477 U.S. 478, 496 (1986).

### 1. Ineffective Assistance of Counsel

Presently, petitioner contends that he received ineffective assistance of counsel because his trial attorney: (1) did not investigate petitioner's assertion of innocence; (2) did not consult or seek out witnesses on petitioner's behalf; (3) refused to call witnesses on petitioner's behalf; (4) did not seek out or hire proper experts; (5) took an adverse stance against him and the evidence; and (6) changed trial tactics mid-trial and then back again. Pet. at 5.  After retaining counsel, petitioner submitted a memorandum of law in further

---

[6] "When a claim has never been presented to a state court, a federal court may theoretically find that there is an 'absence of available State corrective process' under § 2254(b)(1)(B)(i) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile."  Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001) (quoting Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997)).

[7] "A claim is procedurally defaulted when a petitioner fails to raise a claim in state court and can no longer do so."  Siao-Pao v. Connolly, 564 F. Supp. 2d 232, 240 (S.D.N.Y. 2009) (citing Washington v. James, 996 F.2d 1442, 1446 (2d Cir. 1993)).

support of his request for writ of habeas corpus, limiting his ineffective assistance of counsel argument to counsel's factually inconsistent and mutually exclusive defenses at trial.  See Pet. Mem. of Law.  In his direct appeal to the Appellate Division, petitioner focused his ineffective assistance of trial counsel claim on counsel's "irreconcilable defenses."  SR1. at 178-180.  Therefore, at the appellate level, petitioner raised only the factually inconsistent defense issue under the ineffective assistance of counsel claim.

Exhaustion of available state remedies requires presentation of the claim to the highest state court from which a decision can be had.  See Daye, 696 F.2d at 190 n.3. "The requirement that the state court have been given a reasonable opportunity to pass on the federal habeas claim is satisfied if the legal basis of the claim made in state court was the 'substantial equivalent' of that of the habeas claim."  Id. at 192.  Although this requirement does not mean that "there can be no substantial difference in the legal theory advanced to explain an alleged deviation from constitutional precepts," id. at 192 n.4, as this Court held in DeLee v. Graham, a petitioner's failure to include all of his ineffective assistance of counsel claims in his direct appeal and leave application to the Court of Appeals, rendered the unraised claims unexhausted for purposes of federal habeas corpus review.  See DeLee v. Graham, No. 9:11-CV-653 (MAD/CFH), 2013 WL 3049109, at *7 (N.D.N.Y. June 17, 2013).

Petitioner failed to present all of his arguments regarding ineffective assistance of counsel to the highest state court which may have rendered a decision; thus, petitioner's ineffective assistance claim is only exhausted with respect to the one argument he did raise — factually inconsistent defenses.  All other issues under the ineffective assistance claim

are unexhausted. Thus, the undersigned will review only whether trial counsel's presentation of factually inconsistent defenses constitutes ineffective assistance of counsel.

## B. Merits

### 1. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas review only if state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). When evaluating a habeas petition, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. § 2254(e)(1).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal court may not review the habeas petition if the state court's application of Supreme Court precedent was "objectively reasonable." Id. at 409.

## 2. Ineffective Assistance of Trial Counsel

Petitioner argues that his trial counsel set forth "factually inconsistent and mutually exclusive defenses at trial," first "asking the jurors to conclude that no sexual contact occurred," and then "assert[ing] that the sexual contact did occur, that [B.N.] essentially initiated it, and that she was capable of appraising the nature of her efforts." Pet. Mem. of Law at 19. On direct appeal, petitioner argued solely that his trial counsel's assertion of inconsistent defenses violated his right to the effective assistance of counsel. SR1. at 26. The Appellate Division rejected petitioner's argument, concluding that counsel offered meaningful representation. Id. at 177. Respondents argue that the Appellate Division, Fourth Department correctly denied petitioner's ineffective assistance of counsel claim. Resp. Mem. of Law at 35.

The Sixth Amendment mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. "[T]he right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). To prevail on this claim, a petitioner must satisfy a two-prong test showing that his counsel's performance was (1) deficient, and (2) that such deficient performance caused the petitioner actual prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). "Deficient performance" requires the petitioner to show that counsel's performance "fell below an objective standard of reasonableness." Murden v. Artuz, 497 F.3d 178, 198 (2d Cir. 2007) (quoting Strickland, 466 U.S. at 688). "Prejudice" requires the petitioner to show that there is a reasonable

probability that, but for counsel's deficient performance, the outcome would have been different. Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Federal courts apply a "highly deferential" standard of review for a claim of ineffective assistance of counsel alleged in a habeas corpus petition. See Premo v. Moore, 562 U.S. 115, 122-23 (2011) (collecting cases). In assessing a habeas corpus claim, "the question is not whether counsel's actions were reasonable . . . [but it is] whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. (internal quotation marks and citation omitted).

Petitioner has failed to establish that the state courts unreasonably applied Strickland when assessing his claim for ineffective assistance. Petitioner's claim that counsel was ineffective for asserting factually inconsistent and mutually exclusive defenses at trial is without merit. Contrary to petitioner's argument, counsel never conceded that petitioner had sexual contact with B.N. Rather, counsel argued that it was the People's burden to prove, beyond a reasonable doubt, each element of the two-count indictment. Tr.4 at 62-63, 69, 82-83. Counsel contended that the People not only failed to prove beyond a reasonable doubt that B.N. was mentally deficient, but also failed to prove that the DNA evidence conclusively established that petitioner had sexual contact with B.N. Id. at 66-68, 76-77, 96-97. As the Appellate Division concluded, and the respondents argue, these theories are not inconsistent. See Murden v. Artuz, 497 F.3d 178, 198 (2d Cir. 2007) ("It is of course permissible as a legal matter for an attorney to pursue alternative and even factually inconsistent defenses."); see also Morgan v. Lee, No. 10-CV-3954 (NGG)(RER),

2015 WL 5547796, at *7 (E.D.N.Y. Sept. 18, 2015) (determining that the trial counsel's choice to pursue inconsistent theories did not amount to ineffective assistance of counsel because "numerous strategic choices could have support [the trial counsel's] decision to pursue inconsistent defenses . . . [and] [the petitioner] presented no evidence to the state courts indicating that [the trial counsel's] decision to pursue alternative defense was not strategically based."). Relying on the totality of the circumstances and assessing counsel's performance as a whole, the Appellate Division determined that counsel's comments regarding the small amount of DNA found on B.N. did not amount to "an inconsistent defense that no oral sexual conduct occurred." SR1. at 177. Moreover, in denying petitioner's section 440 motion, the trial court concluded that petitioner "failed to meet his burden of demonstrating the absence of a reasonable strategic or other legitimate explanation for counsel's alleged errors," noting that "this ground for relief . . . lacks merit." SR3. at 62.

It is well-settled that "[a]ctions or omission by counsel that might be considered sound trial strategy do not constitute ineffective assistance." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotation marks and citation omitted). Petitioner's arguments allege nothing more than his disagreement with counsel's trial strategy, which is an insufficient basis for an ineffective assistance of counsel claim. See United States v. Sanchez, 790 F.2d 245, 253 (2d Cir. 1986) ("A defendant, of course, may not claim ineffective assistance of counsel merely because in hindsight he thinks counsel's trial strategy was inadequate."). It was reasonable for petitioner's trial counsel to challenge the People's DNA expert regarding the DNA evidence as a part of his trial strategy; in fact, on

direct appeal, petitioner argued in his weight of the evidence claim: "*[a]s defense counsel noted below*, the single sperm cell recovered from the victim's cheek was not scientifically reliably linked to the defendant and, in fact, may have no relevance to the sexual contact alleged in this case." SR1. at 25.  As respondents argue, petitioner acknowledged the merits of counsel's questioning in his direct appeal brief, and likely would have faulted counsel had he not challenged the People's experts regarding the DNA evidence on cross-examination.  <u>See</u> Resp. Mem. of Law at 6, 40-41.  Respondents note that petitioner praised trial counsel for challenging the People's DNA experts in his weight of the evidence claim, and then contends that same line of questioning constituted ineffective assistance of counsel in his ineffective assistance of counsel claim.  <u>See</u> <u>id.</u> at 41.  Petitioner's acknowledgment of the legitimacy of trial counsel's same line of questioning in his weight of the evidence claim serves to further demonstrate the shortcomings of his ineffective assistance argument.

Even if the undersigned had concluded that trial counsel presented inconsistent defenses, any such error would not be "sufficiently egregious and prejudicial" in comparison to counsel's overall performance.  <u>Harrington v. Richter</u>, 562 U.S. 86, 111 (2011) ("And while in some instances even an isolated error can support an ineffective-assistance claim if it is sufficiently egregious and prejudicial, it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy.").  As to counsel's overall performance, the undersigned notes that petitioner was acquitted of the top charge in his indictment.  Tr.5 at 16; see, e.g., Riddick v. Fischer, No. 04-CV-2230, 2004 WL 2181118, at *4 (S.D.N.Y. Sept. 27, 2004) (rejecting habeas relief based on

ineffective assistance of counsel where the "[petitioner] was acquitted of the most serious charges against him[.]").    Indeed, in assessing the strength of the performance of petitioner's trial counsel under the totality of the circumstances, the Appellate Division recognized:

> that defense counsel made a clear and cogent opening statement directed at the People's inability to prove that the victim was incapable of appraising the nature of her conduct, conducted meaningful cross-examination, lodged objections consistent with the defense theory, presented the testimony of an expert who highlighted inconsistencies in the victim's medical records with respect to her coherency and awareness, and obtained an acquittal on the top count of the indictment.

SR1. at 177; see Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland, 466 U.S. at 695-96) ("Any counsel errors must be considered in the 'aggregate' rather than in isolation, as the Supreme Court has directed courts to look at the 'totality of the evidence before the judge or jury.'").

Further, petitioner has not demonstrated that there is a reasonable probability that, but for counsel's deficient performance, the outcome would have been different. Strickland, 466 U.S. at 694. In Lopez v. Ercole, the Southern District of New York found that the facts in the record sufficiently supported a defense of extreme emotional disturbance, and the trial counsel's failure to pursue such defense "fell short of the standard of representation required by the Sixth Amendment." See Lopez, 2010 WL 1628994, at *27-28. The Lopez Court determined that, given the facts set forth in the record, "an [extreme emotional disturbance] defense offered the only realistic escape from the likelihood of a conviction for second degree murder." Id. at 28. The trial counsel's choice to pursue only an "unsupportable" justification defense "placed all hope in a [ ]

defense that was no defense at all." Id.  The Lopez Court concluded that, had the trial counsel set forth an extreme emotional disturbance defense as an alternative to the justification defense, "it is reasonably probable that [the petitioner] would have been convicted of the lesser charge of first degree manslaughter." Id.

Unlike the petitioner in Lopez, petitioner here has not offered evidence to support a conclusion that, but for counsel's decision to argue in the alternative that the People failed to prove that the DNA evidence conclusively established sexual contact, petitioner would have been acquitted of both charges.  There is nothing in the record that supports petitioner's contention that the "incompatibility of these positions" trial counsel presented in his summation impeded the jury from understanding the defense.  Pet. Mem. of Law at 19; see Morgan v. Lee, No. 10-CV-3954 (NGG)(RER), 2012 WL 12324986, at *11 (E.D.N.Y. Aug, 8, 2012), report-recommendation and order adopted by Morgan v. Lee, No. 10-CV-3954 (NGG)(RER), 2015 WL 5547796 (E.D.N.Y. Sept. 18, 2015) (concluding that the record did not support a finding of prejudice where the trial counsel, during his summation, presented theories inconsistent with the petitioner's statement to the police); Pet. Mem. of L. at 19. Trial counsel's "isolated comments" regarding the DNA evidence did not alter the outcome of the case.   See SR1. at 177.  Thus, petitioner has failed to establish prejudice from trial counsel's allegedly deficient performance.

Accordingly, because petitioner has failed to establish that the Appellate Division unreasonably applied Strickland, it is recommended that the petition be denied.

### III. Conclusion

For the reasons stated herein, it is hereby,

**RECOMMENDED**, that Jamison Adist's petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED**; and it is

**RECOMMENDED**, that no certificate of appealability should be issued with respect to any of petitioner's claims as petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2).  See 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); see also Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

DATED:    January 10, 2018
          Albany, New York

Christian F. Hummel
U.S. Magistrate Judge